UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| MS. RAISSA LEVY, MR. JAMES | ) | |
| VILLANUEVA, MS. SHANNA RIVERA, | ) | Civil Action No. |
| MR. ANDRÉ MCCOY individually | ) | |
| and on behalf of all similarly situated | ) | |
| persons, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CLASS ACTION COMPLAINT |
| | ) | |
| CHARLOTTE SCHOOL OF LAW, LLC, | ) | |
| INFILAW HOLDING, LLC., | ) | |
| INFILAW, INC. STERLING PARTNERS | ) | JURY TRIAL REQUESTED |
| And STERLING CAPITAL PARTNERS | ) | |
| Defendants | ) | |

## CLASS ACTION COMPLAINT

The Complaint of MS. RAISSA LEVY, MR. JAMES VILLANUEVA, MS.

SHANNA RIVERA, and MR. ANDRÉ MCCOY, individually and on behalf of all

similarly situated persons, alleges as follows:

### INTRODUCTION

1.    Plaintiffs bring this putative class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure claiming damages based upon, in part, Defendants' failure to

disclose and misrepresentation of its accreditation status by the American Bar

Association (hereinafter "ABA").

2.     As will be shown below, Defendants, jointly, affirmatively represented that the CHARLOTTE SCHOOL OF LAW, LLC (hereinafter "CSL") was, during the class period, fully accredited by the ABA when, in fact, as early as September, 2014, Defendants knew, or should have known, that CSL's accreditation was in jeopardy. Plaintiffs, and the putative class, decided to attend and/or continue to attend CSL and incur cost for tuition based on Defendants' affirmative representations and/or failure to disclose CSL's accreditation status.

3.     In some circumstances, Plaintiffs and the putative class have been damaged and left without the ability to sit for, take and pass the bar exam, to become licensed practicing attorneys, to obtain financial assistance for completion of their education and/or graduated with a degree from CSL that is worth less than what was expected and bargained for had CSL maintained its ABA accreditation. Plaintiffs and the putative classes have sustained economic losses and lost opportunities and many are underemployed or unemployed, which has caused them to sustain damages, as set forth below.

**PARTIES**

4.     Plaintiff, RAISSA LEVY, is a major individual, resident of the State of North Carolina and Florida, and brings this claim individually and as a proposed class representative on behalf of all similarly situated persons.

5.     Plaintiff, JAMES VILLANUEVA, is a major individual, resident of the State of North Carolina, and brings this claim individually and as a proposed class representative on behalf of all similarly situated persons.

2

6.     Plaintiff, SHANNA RIVERA, is a major individual, resident of the State of North Carolina, and brings this claim individually and as a proposed class representative on behalf of all similarly situated persons.

7.     Plaintiff, ANDRÉ MCCOY, is a major individual, resident of the State of North Carolina, and brings this claim individually and as a proposed class representative on behalf of all similarly situated persons.

8.     Defendant, CSL is a for profit limited liability company formed in the State of Delaware, conducting business in the State of North Carolina and within the jurisdiction of this Court, with its principal place of business at 201 S. College Street, Suite 400, Charlotte, North Carolina.

9.     INFILAW Corporation is a foreign corporation, with its principal place of business located at 8625 Tamiami Trail N, Suite 500, Naples, Florida.  INFILAW Corporation is licensed to do and does conduct business within the State of North Carolina and the jurisdiction of this Court.

10.     INFILAW Holding, LLC is a foreign corporation, with its principal place of business located at 1100 Fifth Avenue South, Naples, Florida.  INFILAW Corporation is licensed to do and does conduct business within the State of North Carolina and the jurisdiction of this Court.

11.     STERLING PARTNERS is a foreign corporation with its principal place of business located at 401 North Michigan Avenue, Suite 3300 Chicago, Illinois 60611 and does conduct business within the state of North Carolina and the Jurisdiction of this Court

Case 3:17-cv-00026-GCM     Document 1     Filed 01/19/17     Page 3 of 29

where it holds itself out as a leader in education and is co-headquartered in Chicago and Baltimore.

12.    STERLING CAPITAL PARTNERS is a foreign corporation with its principal place of business located at 401 North Michigan Avenue, Suite 3300 Chicago, Illinois 60611 and does conduct business within the state of North Carolina and the Jurisdiction of this Court.

## JURISDICTION AND VENUE

13.    This Court is vested with subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d) as this is a class action in which the matter in controversy exceeds the sum of value of $5,000,000.00, exclusive of interest and costs and that Plaintiffs and class members are citizens of a state different from all Defendants and the number of all proposed class members is greater than 100.

14.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) as a substantial part of the events or omissions giving rise to this claim occurred within this district. Defendants conduct has occurred within the state of North Carolina, Mecklenburg County.

15.    The Court has personal jurisdiction over Defendants as they each conduct substantial business in Mecklenburg County and at all relevant times have been involved in the daily management, control, finances and direction of CHARLOTTE SCHOOL OF LAW, including the overall management and capital financing of the CHARLOTTE SCHOOL OF LAW and routinely exercise control, management functions and promotion

4

of the CHARLOTTE SCHOOL OF LAW such to be subject to personal jurisdiction of the court.

## FACTS

16.    CSL is an independent, for profit, law school established in 2006.  CSL received provisional accreditation by the ABA in 2008 and was fully accredited in 2011.

17.    Since receiving full accreditation in 2011, CSL has aggressively marketed itself as fully accredited by the ABA.  ABA accreditation requires that CSL comply with accreditation standards, including bar passage rates, job placement, maintaining a rigorous program of legal education that prepares students for admission to the bar and development of standards that deny admittance to applicants who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar.

18.    INFILAW Holdings, LLC and INFILAW Corporation (hereinafter collectively "INFILAW") jointly own, operate, manage and control CSL and are jointly responsible for the acts and omissions of CSL, as described below. INFILAW was responsible for the Career Counseling and Career Development departments at the CSL and employed CSL students and faculty to work on behalf of CSL.

19.    STERLING PARTNERS and STERLING CAPITAL PARTNERS (hereinafter collectively "STERLING PARTNERS") jointly own and actively control, participate, guide and stand with INFILAW in its operations of the CSL. STERLING PARTNERS held itself out as experts in the education field and in actively managing the CSL business unit directly and through INFILAW.

5

20.     INFILAW is financially and operationally backed by STERLING
PARTNERS. STERLING PARTNERS has stated in its public record documents and
website  ( http://sterlingpartners.com )  that it provides ongoing management support to
CSL with a purported dedicated team of industry veterans, operators, strategy experts and
human capital professionals to maximize its financial returns, to demonstrate a balance of
entrepreneurship and institutional discipline and STERLING PARTNERS continues to
holds itself out as a leader in education, healthcare and business services.

21.     Currently, tuition at CSL is approximately $44,284.00 per year for full-time
and $35,822.00 per year for part-time students.  There are over 900 students who are
currently enrolled at CSL.  CSL admits approximately 65% of all applicants, which is one
of the highest admission rates for any accredited law school.  Given the cost of tuition,
utilizing a lax admission standard to admit students who are not objectively qualified
boosts Defendants' gross revenue. The cost to attend is excessive, inflated, and is not
proportional to the low value of the education offered.

22.     INFILAW privately owns three for-profit law schools:  CSL, Florida
Coastal School of Law and Arizona Summit Law School.  According to its website
(http://www.infilaw.com), INFILAW's mission is to "establish the benchmark of
inclusive excellence in professional education for the Twenty-First Century.  This
mission is supported by three key pillars: (1) centering on serving the underserved, (2)
providing an education that is student-outcome centered; and (3) graduating students who
are practice ready.

6

23.     ABA accreditation carries significant importance to a law school as it signifies compliance with high standards of education and helps insure applicants possess the ability to complete the curriculum and pass the bar exam.  CSL marketed itself, during the Class Period, as fully accredited by the ABA, which carried with it the express representation that CSL complied with all ABA accreditation requirements.  Plaintiffs, and Class Members who enrolled in and attended CSL during the Class Period, did so with the express understanding and expectation that CSL was and would remain ABA accredited.  The Class Period includes all current students, former students and alumni who attended CSL between 2010 and the present time.

24.     ABA accreditation is not permanent.  The ABA conducts periodic reviews of accreditation.  In March, 2014, the ABA conducted a Three Year Interval evaluation of CSL.  Representatives of the ABA met with CSL staff, owners, administrators, faculty, and students, and also conducted an onsite inspection.

25.     In September, 2014, the ABA provided CSL with its inspection report.  The inspection report is a step in the process of determining whether CSL continues to comply with ABA accreditation standards.  The inspection report revealed deficiencies regarding CSL's compliance with ABA accreditation standards.  In October, 2014, CSL responded to the ABA's inspection report.

26.     After considering the inspection report, and CSL's response, the ABA concluded there was "reason to believe" that CSL had "not demonstrated compliance" with several ABA standards.

7

27.     Specifically, the ABA requested that CSL provide information regarding its potential non-compliance with the following standards:

a.     Standard 301(a) mandates that a "law school shall maintain a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession.

b.     Standard 501(a) requires a law school to "maintain sound admission policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education."

c.     Standard 501(b) instructs that a "law school shall not admit an applicant who does not appear capable of satisfactorily completing its program of legal education and being admitted to the bar."

d.     Interpretation 501-1 states: "Among factors to consider in assessing compliance with this Standard are the academic and admission test credentials of the law school's entering students, the academic attrition rate of the law school's students, the bar passage rate of its graduates, and the effectiveness of the law school's academic support program."

28.     CSL responded to the ABA's request for information. After receiving CSL's response to its request for information, the ABA issued a second determination on or about February 3, 2016 that CSL was not in compliance with the above standards and found that:

[CSL] has not demonstrated that it is maintaining a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession; maintaining sound admissions policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education; or is admitting applicants who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar. (Second Committee Decision at 6, citing Findings of Fact 8-20)

8

29.    Thereafter, the ABA held a hearing on June 23, 2016, which CSL principals and employees attended and participated.  Subsequently, in July, 2016, the ABA issued a decision, finding that CSL was not in compliance with Standards 301(a), 501(a), 501(b), and Interpretation 501-1, and that CSL's non-compliance was substantial and persistent.

30.    On November 14, 2016, the ABA issued its "Notice of Probation and Specific Remedial Action" finding that CSL was not in compliance with accreditation standards and that its non-compliance was "substantial" and "persistent" and that CSL's efforts to achieve compliance were not proven effective or reliable.  On November 14, 2016, CSL was placed on probation and ordered to inform its students of the remedial actions the school was required to take.

31.    On December 19, 2016, CSL was notified by the U.S. Department of Education that it had denied CSL's application for continued participation in the Student Financial Assistance Programs authorized by Title IV of the Higher Education Act of 1965.  Accordingly, current students at CSL who were previously eligible for federal student loans to pay all or some of the cost of attending CSL are no longer eligible for USDOE financial aid or assistance.

32.    Defendants knew as early as September, 2014 that its ABA accreditation was in jeopardy.  Despite this knowledge, Defendants failed to take steps to comply with ABA accreditation requirements or to implement steps that would have resulted in continued ABA accreditation.  Defendants instead continued to advertise and market CSL

as an ABA accredited law school knowing that it was obligated to fully disclose its current ABA accreditation status, which it failed to do.

33. According to information published by the ABA pursuant to its Standard 509 Information Report, in 2014 and 2015, full-time tuition per year at CSL was approximately $41,348.00, and part-time was $33,448.00. In 2016, full-time tuition rose to $44,284.00, and part-time to $35,822.00, per academic year. Students agreed to pay this tuition with the expectation that they would attend, and reap the benefits of, an ABA accredited institution.

34. CSL was notified three times in 2016 that they were not compliant with ABA accreditation standards. CSL failed to comply with the ABA order that it publicize to its students and the public its probationary status as of July, 2016. This information was not made public until November, 2016.

35. CSL advised its students that the ABA accreditation committee issued a letter that was "mainly positive" but noted a few areas that "could be strengthened." Such communication did not accurately describe CSL's accreditation status with the ABA. CSL failed to inform its students and potential students that the ABA determined that CSL had "not demonstrated that it is maintaining a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession" until November, 2016.

36. CSL also did not timely notify students or potential students of the nature, scope and extent of its accreditation deficiencies, nor did it disclose during the Class

Period that it was admitting applicants who did not appear capable of satisfactorily completing its program of legal education and being admitted to the bar.

37.     Despite actual knowledge as early as September, 2014 that its ABA accreditation was in jeopardy, CSL promoted and maintained on its website, in its advertising, and in numerous public statements that it was, in all respects, ABA accredited and compliant.  Furthermore, CSL claimed that students who were admitted to CSL appeared capable of satisfactorily completing its program and being admitted to the bar. Contrary to the facts, Defendants jointly promote, that CSL continues to deliver high quality student outcomes including a 90+% job placement and bar pass rate.

38.     CSL would routinely award "Full Scholarships" to incoming first year law students to entice said students to attend the school. The "Full Scholarship" would require the student to maintain a certain grade point average. CSL would then group all scholarship students into the same class to compete among themselves, knowing that the grading curve would cause 75% of the students to be below the minimum G.P. A. standard at the conclusion of their first semester. This trick would allow CSL to discontinue 75% of the "Full Scholarships" for these students. This deceptive practice required the students, if they desired to remain in class, to apply for Federal Student Aid. CSL went from paying out on a scholarship to directly receiving tuition through Federal Student Aid.

## PLAINTIFFS' SPECIFIC FACTUAL ALLEGATIONS

39.    Plaintiff, Ms. Raissa Levy, a class representative, enrolled at CSL in the summer program of 2016 and is a first year law student. Ms. Levy wants to obtain a law degree, become a lawyer, and pursue a vocation in which she believes can change people's lives for the better.

40.    Ms. Levy relied upon the representations made by CSL that it was fully accredited with the ABA, was reputable in the legal community, and had a proven track record of great success both with its bar exam passage rate and with primer legal employment opportunities. Ms. Levy relied upon the schools laudatory advertisements and representations set forth and published in its material, posted on the website, discussed and promoted verbally CSL personnel and contained in other marketing materials.

41.    Specifically, Ms. Levy relied upon CSL' s material representations that the school was and would remain in full compliance with each and every standard required by the ABA to be fully accredited. This included the standards relating to employment opportunities, to bar passage and to a rigorous academic program to prepare for a successful law career.

42.    Ms. Levy required substantial student loans to attend school and relied upon the schools representations that she would continue to qualify and be awarded the federally guaranteed student loans as long as she remained enrolled in the school. Now that is all in jeopardy as the loans are subject to the school remaining accredited which appears tenuous.

12

43. Ms. Levy and similarly situated class members have suffered financial, economic and pecuniary damages as a result of Defendants' joint and several conduct.

44. Plaintiff James Villanueva, a class representative, enrolled at CSL in the fall of 2015. Mr. Villanueva moved his family from Florida to attend school. Mr. Villanueva is passionate about helping people and had worked in Florida state government helping the citizens of Florida. Mr. Villanueva was recruited to attend CSL to pursue a law education.

45. Mr. Villanueva specifically relied upon the material representations, now known to be false, made by CSL about the quality of its legal education, its bar passage rate, its ABA accreditation status and its high rate of successful placement of its graduates into paying legal positons. As a result of this reliance, Mr. Villanueva not only resigned from his position in Florida but, based on the promises of CSL, persuaded his spouse to leave her employment in Florida and find a new job in the Charlotte North Carolina market.

46. Upon learning that the ABA had determined CSL was deficient Mr. Villanueva immediately looked for an accredited law school to which he could transfer. Mr. Villanueva, who was a 2L at CSL, was able to transfer to the University of South Carolina Law School in Columbia, South Carolina. He was not able to transfer 17 credit hours and will have to take additional hours to graduate.

47. Mr. Villanueva now travels three hours roundtrip every school day to law school in Columbia and returns home in the evening. He must drive, fight traffic, complete his homework, be available for all student functions and also tend to a family.

The damages are great and the economic, physical and emotional toll this change has and will continue to have is substantial. The damages are ongoing for all of the class.

48. Based on the representations made by CSL, Mr. Villanueva took out substantial Grad Plus loans and continues to be obligated to repay those loans while becoming obligated to pay for additional tuition for the USC law school. The loans incurred included the credit hours that USC Law School would not accept upon transfer. Mr. Villanueva is required to complete an additional seventeen (17) class hours in order to further progress for his degree. On information and belief the CSL credit hours would not transfer because CSL's academic standards are deemed suspicious in the legal education community.

49. Mr. Villanueva was the number 1 academically ranked student in the CSL second year law class, a ranking he lost upon transfer. Despite Mr. Villanueva's great efforts and academic success he has suffered great loss. Mr. Villanueva has lost time, lost money, lost credits, become obligated for loans and he moved his entire family to Charlotte on the representations made by CSL. Instead of the promised result, CSL's loss of accreditation caused him to transfer and required him to commute three hours every class day.

50. Mr. Villanueva and similarly situated class members have suffered financial, economic and pecuniary damages as a result of Defendants' joint and several conduct.

14

51.     Plaintiff Shanna Rivera, a class representative, enrolled at CSL in the fall of 2012. Ms. Rivera always wanted to be an attorney and was offered a scholarship to CSL and another accredited law school.

52.     Ms. Rivera specifically relied upon the material representations, now known to be false, made by CSL about the quality of its legal education, its bar passage rate, its ABA accreditation status and its high rate of successful placement of its graduates into legal positons. As a result of this reliance, Ms. Rivera declined scholarship offers to another reputable nonprofit law school and instead, to her detriment, enrolled in CSL.

53.     Ms. Rivera graduated from CSL in May 2015 and sat and passed the bar in July 2015. Since graduation Ms. Rivera has been unable to find permanent gainful legal employment. This failure is directly due to CSL's poor reputation in the legal community factually established by its ever-present and now well-known accreditation issues, it historic low bar exam passage rate and it low employment placement record.  Had Ms. Rivera timely and fully known these facts she would have enrolled or would have transferred to a non-profit, accredited, reputable and established law school.

54.     Based on the representations made by CSL Ms. Rivera took out substantial loans and now is obligated to repay loans that greatly exceed the value of the CSL degree she obtained. The CSL academic standards are so suspicious in the legal community that getting reasonable gainful legal employment is difficult to non-existent.

55.     Ms. Rivera, even though she passed the July 2015 bar exam on first attempt, was offered by CSL officials $5000.00 to defer her exam test date from July

15

2015 to the winter 2016 exam date. CSL included in this offer the prize of a free CSL corporate compliance course valued by CSL at $9000.00. CSL made this offer in order to help CSL present a high bar passage rate for both exam sessions.

56.     Despite Ms. Rivera's great efforts and academic and bar exam success she now fears that she will not be able to obtain a job in the legal field as the value of a CSL law degree is diminished. The high cost to attend CSL and her proportionate indebtedness cause her to be saddled with significant student loans and other foreseeable and sustained economic and pecuniary damages.

57.     Ms. Rivera and similarly situated class members have suffered financial, economic and pecuniary damages as a result of Defendants' joint and several conduct.

58.     Plaintiff Andre McCoy, a class representative, enrolled at CSL in the fall of 2013. Mr. McCoy wanted to be an attorney and was offered a scholarship to attend CSL.

59.     Mr. McCoy specifically relied upon the material representations, now known to be false, made by CSL about the quality of its legal education, its significant bar passage rate, its solid ABA accreditation status and its high rate of successful placement of its graduates into well-paying legal positons. As a result of this reliance, Mr. McCoy accepted the scholarship, took out federal student loans and agreed to attend CSL.

60.     Mr. McCoy graduated from CSL in May 2016, paid for and attended the CSL bar preparatory classes and sat for the North Carolina bar exam in July 2016. He did not pass. Since graduation Mr. McCoy has been unable to find sufficient gainful legal employment. This failure is directly due to CSL's poor preparation of its students and its

16

poor reputation in the legal community, factually established by its ever-present and now well-known accreditation issues, it historic low bar exam passage rate and it low employment placement record.

61.     Had Mr. McCoy timely and fully known these facts he would have enrolled or would have transferred to a non-profit accredited, reputable and established law school.

62.     Based on the representations made by CSL, Mr. McCoy had taken out substantial loans and now is obligated to repay loans that greatly exceed the value of the CSL degree he obtained. The CSL academic standards are so suspicious in the legal community that getting reasonable gainful legal employment is difficult to non-existent.

63.     Despite Mr. McCoy's great efforts, he now believes that he will not be able to obtain a job in the legal field as the value of a CSL law degree is diminished. In addition the high cost to attend CSL and his indebtedness cause him to be saddled with significant student loans and other foreseeable and sustained economic and pecuniary damages.

64.     Mr. McCoy and similarly situated class members have suffered financial, economic and pecuniary damages as a result of Defendants' joint and several conduct.

## CLASS ACTION ALLEGATIONS

65.     Plaintiffs bring this putative class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following class:

> Any person who paid any amount to attend CSL at any time
> from September 1, 2014 through the present.  Excluded from
> the class are all judges and court personnel employed by the

17

United States District Court for the Western District of North Carolina and all officers, directors and employees of Defendants.

66.    The Class consists of over 1000 individuals. The Class is so numerous that joinder of all Class Members is impractical. The exact size of the Class and identities of the individual Class Members are ascertainable through Defendants' records.

67.    The claims of Plaintiffs are typical of the claims of the class members. Plaintiffs' and the Class Members' claims are based on the same legal theories and arise from the same course of conduct attributable to Defendants and result in the same injury to Class Members.

68.    The Class Members have a well-defined community of interest. Defendants acted, and failed to act, on grounds generally applicable to Plaintiffs and all Class Members requiring the Court's imposition of uniform relief to insure compatible standards of conduct toward all Class Members.

69.    There are numerous questions of law and fact common to the claims of Plaintiffs and the Class Members, and these questions predominate over any questions that may affect only individual Class Members within the meaning of Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3). The common questions of fact and law include, but are not limited to the following:

    a.    The nature and extent that CSL misrepresented its ABA accreditation status;

    b.    Whether CSL maintained a rigorous program of legal education that prepared its students, upon graduation, for admission to the bar and

18

for effective, ethical and responsible participation as members of the legal profession;

c.   Whether CSL maintained sound admission policies and practices consistent with ABA standards, its mission, and the objectives of its program of legal education;

d.   Whether CSL admitted applicants who were not capable of satisfactorily completing its program of legal education and being admitted to the bar;

e.   Whether CSL's actions constituted misrepresentation or suppression of its ABA accreditation status;

f.   Whether CSL's public statements regarding its ABA accreditation compliance were false, misleading, or improper;

g.   Whether Defendants violated the North Carolina Unfair and Deceptive Trade Practice Act, N.C. Gen. Stat. §75-1.1, *et seq.*;

h.   Whether Defendants breached an express warranty made to the Class;

i.   Whether CSL's public statements regarding its ABA accreditation compliance, job placement and bar passage rates were negligent and/or intentional and misleading;

j.   Whether CSL's public statements regarding its ABA accreditation compliance, and/or its job placement and/or its bar passage rates constituted a breach of contract;

19

k.     Whether CSL's public statements regarding its ABA accreditation compliance constituted a breach of the covenant of good faith and fair dealing;

l.     Whether Defendants are liable for punitive damages;

m.     Whether the INFILAW Defendants are jointly, independently, and/or vicariously liable for the acts and/or omissions of CSL.

n.     Whether the STERLING PARTNERS Defendants are jointly, independently, and/or vicariously liable for the acts and/or omissions of CSL and/or INFILAW.

70.     Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs are, in all respects, adequate Class Representatives and have retained counsel with substantial experience in prosecuting complex litigation and class actions. Neither Plaintiffs, nor their counsel, have any interests adverse to those of the Class.

71.     A class action is superior to other methods of litigating this matter and will result in a fair and efficient adjudication of this controversy. Class treatment of common questions of law and fact is superior to multiple, individual actions or piecemeal litigation as it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

72.     This action is brought and may be properly maintained as a Class Action pursuant to Federal Rule of Civil Procedure 23(b) as the requirements of numerosity, commonality, typicality, adequacy, predominance and superiority are satisfied.

20

## COUNT I

### VIOLATION OF NORTH CAROLINA GENERAL STATUTE 75-1.1, THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICE ACT

73.     CSL affirmatively asserted and represented in its communications and publications that it was compliant with all ABA standards and that its curriculum, admissions process, and bar passage rates complied with ABA standards.  These communications were deceptive and/or had a tendency to deceive and/or misrepresented the true state of CSL's ABA accreditation.

74.     Defendants' deceptive publications and misrepresentations affected commerce as the Class, collectively, spent millions of dollars, including student and other loans, in tuition in reliance upon Defendants' statements.  Plaintiffs seek a refund of the cost associated with tuition, books and fees paid to CSL during the Class Period.

75.     Defendants' violation of the North Carolina Unfair and Deceptive Trade Practice Act was the proximate cause for the Class' monetary loss, loss of income, loss of wage earning capacity, employment opportunity, as well as incurrence of debt and mental anguish and emotional distress.

76.     Defendants' actions, as described above, were willful.

77.     Plaintiffs and the Class are entitled to treble damages caused by Defendants' unfair and/or deceptive conduct.

78.     Plaintiffs are entitled to attorney fees and all other damages allowed under the North Carolina Unfair and Deceptive Trade Practice Act.

## COUNT II

### UNJUST ENRICHMENT

79.     As a result of Defendants' misrepresentations, Defendants derived a financial benefit in the form of students choosing to enroll and/or stay enrolled at CSL and pay and continuing to pay tuition when, had CSL adequately and fully disclosed its ABA accreditation status, Class Members would not have enrolled at CSL during the class period.

80.     Accordingly, Defendants should be required to disgorge all payments and refund all monies paid by Plaintiffs and the Class Members, receipt of which unjustly enriched Defendants.

## COUNT III

### BREACH OF CONTRACT

81.     CSL, through its admissions and public statements and publications, offered to provide Plaintiffs and the Class with an education at and a degree from an accredited law school that complied with all ABA standards, including a rigorous curriculum that was created to insure that students were equipped with practical skills that would allow them to thrive in a professional setting.

82.     CSL, through its admissions and public statements and publications, represented that its admission standards were in accordance with ABA standards and that those students admitted to CSL possessed the capabilities of satisfactorily completing its program of legal education and being admitted to the bar.

22

83.     These representations made by CSL constituted both an express and implied contract between CSL and Plaintiffs and the Class.

84.     CSL's actions in failing to fulfill its obligations to maintain its ABA accreditation and operate its school in accordance with the standards set forth by the ABA materially breached the terms of its contract with Plaintiffs and the Class.

85.     Accordingly, Plaintiffs and the Class have suffered damages for breach of contact including loss of tuition, loss of ability to complete education, loss of income, loss of employment opportunities, incurrence of debt, underemployment and unemployment, and mental anguish and emotional distress.

## COUNT IV

### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

86.     CSL owed a duty and obligation to act in good faith in the performance of the terms and conditions of the contract that existed between CSL and Plaintiffs and the Class.

87.     By failing to operate and maintain CSL in accordance with ABA accreditation standards, CSL breached its covenant of good faith and fair dealing owed to Plaintiff and the Class.

88.     CSL's breach of the covenant of good faith and fair dealing have caused Plaintiffs and the Class to suffer damages for breach of contact including loss of tuition, loss of ability to complete education, loss of income, loss of employment opportunities, incurrence of debt, underemployment and unemployment, and mental anguish and emotional distress.

## COUNT V

### NEGLIGENT MISREPRESENTATION

89.     CSL owed a duty to Plaintiffs and the Class to provide accurate information

concerning CSL's ABA accreditation.

90.     Instead of disclosing all pertinent facts regarding the manner in which CSL

operated its school and the status of its ABA accreditation, including inquiries into

compliance as early as September, 2014, CSL misrepresented its ABA accreditation

compliance status to Plaintiffs and the Class Members.

91.     CSL's negligent misrepresentation of its ABA accreditation status

constitutes negligent misrepresentation, relied upon by Plaintiffs and the Class Members,

which resulted in Plaintiffs and the Class Members suffering damages for loss of tuition,

loss of ability to complete education, loss of income, loss of employment opportunities,

incurrence of debt, underemployment and unemployment, and mental anguish and

emotional distress.

## VI.

### INTENTIONAL MISREPRESENTATION

92.     Since approximately September, 2014, Defendants knew, or should have

known, that CSL was not in compliance with ABA accreditation standards.  Despite this

knowledge, CSL intentionally misrepresented its ABA compliance status which induced

Plaintiffs and the Class Members to enroll and/or continue their education at CSL.

93.     CSL's intentional misrepresentations during the class period caused

students to enroll in CSL and expend funds for enrollment when, had such intentional

24

misrepresentations not been made, Plaintiffs and the Class Members would not have done so.

94.    CSL's intentional misrepresentation of its ABA accreditation status resulted in Plaintiffs and the Class Members suffering damages for loss of tuition, loss of ability to complete education, loss of income, loss of employment opportunities, incurrence of debt, underemployment and unemployment, and mental anguish and emotional distress.

## VI.

### UNCONSCIONABILITY

95.    The plaintiffs reassert, reallege and incorporate herein the prior allegations and state that the defendants conduct, material misrepresentations, material omissions of relevant facts and their failure to provide the promised educational opportunities, employment opportunities and a degree respected in the community, the amount paid by the respective plaintiffs to the defendants was unconscionable as a matter of law.

## VII.

### STERLING PARTNERS, INFILAW AND CSL ARE JOINT TORTFEASORS LIABLE FOR EACH OTHER'S ILLEGAL ACTS, OMISSIONS AND CULPABLE CONDUCT IN CAUSING HARM.

96.    The defendants, STERLING PARTNERS, INFILAW and CSL were, at all relevant times, joint active participants' in the illegal conduct, policy protocols, misdirection, cover up and omissions of material facts to the student body of CSL including the plaintiffs and the respective classes. The result of said joint conduct caused and continues to cause the plaintiffs and the respective classes to be injured, harmed, and financially damaged.

97.     That each of the defendants failed to follow a duty of conduct imposed by law and thus are jointly culpable for the conduct of the other even if one of them did not directly cause the injury as each assisted the other, encouraged the others to engage in conduct it knew or should have known was a breach of the standards of conduct.

98.     That the respective defendants are contractually, factually and through their conduct and omissions, jointly responsible for each other's conduct as all defendants were active participants in the illegal behavior and active in the management, control and functioning of the CSL for profit business unit.

99.     The conduct of one defendant is charged to all and is a legal proximate cause of the injury and damages as the respective defendants conduct including the misrepresentations and omissions of material fact are a natural and continuous sequence of material omissions, misrepresentations and misdeeds which a reasonable and prudent person would have foreseen would more likely than not produce such injury and damages.

100.    That pursuant to North Carolina law, the joint conduct of multiple Tortfeasors is a proximate cause of the damages and the respective defendants are jointly responsible for the liability, injury and the damages. Their joint culpable conduct, as pled herein in this matters establishes, as a matter of law, that each defendant is responsible and culpable for the joint acts and omissions of the other defendants.

# VIII.

## PUNITIVE DAMAGES

101.   Defendants' actions were done intentionally, recklessly, willfully, wantonly and in disregard for the rights of Plaintiffs and the Class.

102.   The acts and omissions of Defendants justify imposition of punitive damages in an amount sufficient to deter or prevent a similar course of conduct in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that, after due proceedings had, that the Court enter judgment herein in favor of Plaintiffs and against Defendants, jointly, as follows:

1)   That, pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court certify the following class:

> Any person who paid any amount to attend CSL at any time from September 1, 2014 through the present. Excluded from the class are all judges and court personnel employed by the United States District Court for the Western District of North Carolina and all officers, directors and employees of Defendants.

2)   That the Court appoint undersigned counsel as Class Counsel and Plaintiffs as Class Representatives;

3)   That the Court award Plaintiff and the Class compensatory, statutory and punitive damages as allowed by law and as requested in the Complaint including loss of income, loss of employment opportunities, loss of educational opportunities, loss of opportunities for timely career

27

advancement, obligations to repay significant debt without just consideration, physical and emotional damages and all other pecuniary damages allowed by law;

4) That the Court treble all compensatory damages and award attorney fees pursuant to the North Carolina Unfair and Deceptive Trade Practice Act;

5) That the Court award all costs and legal interest as allowed by law;

Further, Plaintiffs request trial by jury on all issues against all parties.

Respectfully submitted:

*/s/ Daniel R. Francis*

_____
Daniel R. Francis
N.C. Bar Number 44131
drfrancis@crumleyroberts.com
Brian L. Kinsley
N.C. Bar Number 38683
blkinsley@crumleyroberts.com
CRUMLEY ROBERTS, LLP
Attorneys for Plaintiffs
2400 Freeman Mill Road
Greensboro, North Carolina 27406
Phone:        (336) 333-9899
Facsimile:    (336) 333-9894

28

*/s/ Amanda A. Mingo*

_____

Amanda A. Mingo
NC Bar No. 24423
amingo@rsfmlaw.com
RAWLS, SCHEER, CLARY &
MINGO, PLLC
1011 East Morehead Street, Suite 300
Charlotte, NC 28204
Phone:          704-376-3200
Facsimile:     704-332-2716


Philip Bohrer (Appearance anticipated)
phil@bohrerbrady.com
BOHRER BRADY, LLC
8712 Jefferson Highway, Suite B
Baton Rouge, Louisiana 70809
Telephone: (225) 925-5297
Facsimile: (225) 231-7000

29